**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION**

| | |
|---|---|
| JAMIE WEATHERFORD and KIMBERLY WEATHERFORD, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>E.I. DUPOINT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, FC, LLC, 3M COMPANY, DAIKIN AMERICA, INC., DAIKIN INDUSTRIES, LTD., and MITSUBISHI INTERNATIONAL POLYMERTRADE CORPORATION,<br><br>Defendants. | Civil Action No.: 4:22-CV-01427-RBH<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. NEGLIGENCE**<br><br>**2. STRICT LIABILITY**<br><br>**3. TRESPASS**<br><br>**4. NUISANCE**<br><br>**5. PRODUCT LIABILITY FOR DEFECTIVE DESIGN**<br><br>**6. BREACH OF IMPLIED WARRANTIES**<br><br>**(JURY TRIAL DEMANDED)** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Jamie and Kimberly Weatherford, bring this Class Action Complaint and Demand for Jury Trial (the "Complaint") on behalf of themselves and all others similarly situated against E.I. Dupont De Nemours & Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company, individually and as successor in interest to DuPont Chemical Solutions Enterprise, The Chemours Company FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, 3M Company, f/k/a Minnesota Mining and Manufacturing Company, Daikin America, Inc., Daikin Industries, Ltd., and Mitsubishi International PolymerTrade Corporation and hereby allege as follows:

1

## NATURE OF THE ACTION

1.  This is a civil action for compensatory and punitive damages, costs incurred and to be incurred by Plaintiffs, and any other damages that the Court or jury may deem appropriate for property damage as a result of contamination by a class of chemicals known as PFAS that are used in the treatment and finishing of textiles.

2.  Perfluorooctanoic Acid ("PFOA") and Perfulorooctanesulfonic Acid (PFOS") (collectively referred to as "PFAs") are man-made chemical compounds that have become notorious as global environmental contaminants—found in bays, oceans, rivers, streams, soil, and air. As a result, PFAs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

3.  Even in very small doses, these chemicals can cause testicular, pancreatic, uterine and kidney cancer, as well as liver disease, thyroid disease, ulcerative colitis and pregnancy-induced hypertension, among other illnesses.

4.  From 1966 until 2016, the textile plant known as the Galey & Lord Plant operated in Society Hill in Darlington County as a textile dyeing and finishing plant. In 2016, the 234 acres site was abruptly abandoned and the site was not remediated. Even prior to the abandonment of the site, wastewater generated by the plant was an environmental concern.

5.  As a result of the textile operations at the Galey & Lord Plant, the adjacent Cedar Creek and the Great Pee Dee River are polluted with harmful PFAs.

6.  Additionally, beginning in 1993 and continuing until at least 2013, the purchasers of Defendants hazardous product spread industrial sludge dredged from the wastewater ponds over fields as fertilizer throughout South Carolina. Both the wastewater and the sludge produced by the wastewater treatment contained the chemical products manufactured and distributed by the Defendants. The Defendants, by supplying these chemical products to the site and withholding information about their hazardous materials, participated in activities that have willfully, wantonly,

recklessly, and negligently discharged toxic chemicals into the surface and ground water, into the soil, and into the bodies of the public. Defendants knew that these chemicals were extremely dangerous. Nevertheless, Defendants distributed these chemicals knowing that it was inevitable the chemicals would go into the water and the soil surrounding the Galey and Lord Plant.

7.     Plaintiffs and their real properties and their nearby surface waters have been invaded by, exposed to, and suffered damage from dangerous amounts of toxic chemicals released into the soil and water as a result of the operations at the Galey and Lord Plant.

8.     This class action is on behalf of all residents and business owners who experienced, and will continue to experience serious property damage caused by Defendants' conduct. These damages include, among other things: the cost of filtering contaminated air and water; the cost the cost of cleaning and replacing contaminated property, plumbing, fixtures, and appliances; loss of use and enjoyment of contaminated property; the reduced value of property and businesses due to the contamination and continuing trespass; and the anxiety Plaintiffs felt when the realized that they had been breathing and drinking contaminated air and water. Plaintiffs are seeking monetary damages and injunctive relief to address all these past, present, and future injuries.

## JURISDICTION AND VENUE

9.     Plaintiffs Jamie and Kimberly Weatherford are citizens of the State of South Carolina, residing at 641 Journeys End, Darlington, South Carolina 29540.

10.    Defendant E.I. Dupont De Nemours & Company ("Dupont") is organized and headquartered in the State of Delaware, having a principal place of business located at 1007 Market Street Wilmington, Delaware 19899. Dupont has owned manufacturing facilities in South Carolina for decades and has systematically and continuously done business in South Carolina for the entire tenure of the acts giving rise to these claims including the manufacture and distribution of PFOA and/or PFAS chemicals used in South Carolina and at the Galey & Lord facility in Society Hill.

11.    DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont

Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19899.

12.    Defendant 3M Company f/k/a Minnesota Mining and Manufacturing Company ("3M") is a Delaware Corporation and conducts business throughout the United States, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144 has systematically and continuously done business in South Carolina for the entire tenure of the acts giving rise to these claims including the manufacture and distribution of PFOA and/or PFAS chemicals used in South Carolina and at the Galey & Lord Plant in Society Hill.

13.    Defendant The Chemours Company ("Chemours") is organized and headquartered in the State of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19899. Chemours has systematically and continuously done business in South Carolina including the manufacture and distribution of PFAS chemicals used in South Carolina and at the Galey & Lord facility in Society Hill.

14.    Defendant The Chemours Company FC LLC ("Chemours FC"), a successor in interest to DuPont Chemical, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC has systematically and continuously done business in South Carolina including the manufacture and distribution of PFAS chemicals used in South Carolina and at the Galey & Lord facility in Society Hill.

15.    Defendant Daikin America, Inc. ("Daikin") is a corporation organized under the laws of, and existing in, the State of Delaware, with its principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962. Dakin was established in 1991 as a subsidiary of Daikin Industries, Ltd., a foreign corporation based in Osaka, Japan. Daikin is a developer and manufacturer of fluorochemical products. Daikin has systematically and continuously done business in South Carolina including the manufacture and distribution of PFAS chemicals used in South Carolina at the

4

Galey & Lord facility in Society Hill.

16.     Defendant Mitsubishi International PolymerTrade Corporation ("MIP") is a corporation organized under the laws of, and existing in, the State of New Jersey, with its principal place of business located at 2 Penn Plaza E, Newark, New Jersey 07105. MIP has systematically and continuously done business in South Carolina including the manufacture and distribution of PFAS chemicals used in South Carolina at the Galey & Lord facility in Society Hill.

17.     This Court has subject matter jurisdiction over this Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, as the proposed Class, (1) at least one member of the proposed Class, which consists of at least 100 members, is a citizen of a different state than Defendants; (2) the claims of the proposed Class Members exceed $5,000,000 in the aggregate, exclusive of interest and costs, and (2) none of the exceptions under that subsection apply to this action.

18.     Personal jurisdiction over Defendants is proper because Defendants systematically transacted and conducted business in the State of South Carolina and a substantial number of the events giving rise to the claims alleged herein took place in South Carolina.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District, where defendants do substantial business so as not to offend the traditional notions of fair play and substantial justice.

## STATEMENT OF FACTS

20.     In 1947, 3M began producing perfluorooctanoic acid (PFOA). PFOA is part of a group of chemicals created and used as a surfactant and coating with properties that resist stains and water. This grouping has been referred to generically or broadly as PFC's or as PFAS.

21.     Shortly after, in 1951, Dupont began purchasing PFOA from 3M and began using it in the production of Teflon. Dupont called the chemical C8 because of its molecular structure.

22.     By 1954, Dupont employees were expressing concern about the toxicity of C8.

23.     In 1956, 3M begins selling Scotchgard Protector, touting its ability to repel stains, an ability created by toxic fluorochemicals with the same or similar structure as PFOA.

24.     These early developments set the stage for the distribution by Dupont and 3M to distribute PFC's throughout the country and the world.

25.     These chemicals have been used heavily by the textile industry for stain resistance and water resistance.

26.     The Galey and Lord Plant is a former textile dyeing and finishing plant, located in northeastern South Carolina, at 670 North Main Street in Society Hill. Operations began in 1966 and included dyeing, finishing, and surface treatment of cotton and synthetic fabrics. The textiles treated and finished at the facility went to multiple known brand names of retail clothing as well as other applications. The site occupies about 234 acres and was associated with multiple textile manufacturing facilities.[1]

27.     The wastewater generated from textile manufacturing was treated in the wastewater treatment plant (WWTP), which included several basins (0.2 to 9.65 acres) located adjacent to Cedar Creek and the Great Pee Dee River.[2]

28.     The plant was abandoned in 2016. The WWTP was shut down but was not remediated or cleaned, and the basins are at capacity. As a result of textile operations, the wetlands and sediments of Cedar Creek and the Great Pee Dee River are contaminated with metals, perfluorooctanoic acid (PFOA), and perfluorooctanesulfonic acid (PFOS). PFAO and PFOS are fluorinated, organic, man-made compounds that are used to make fluoropolymer coatings and products that resist heat, oil stains, grease, and water.[3]

29.      In 2018, Hurricane Florence made landfall and several WWTP basins flooded

---

[1] EPA website -
https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0403308#bkground
[2] Id.
[3] Id.

releasing wastewater to Cedar Creek and the Great Pee Dee River.[4]

30.     As part of the regular operations of the facility, the plant used PFC's including C8 to treat textiles for stain resistance and water resistance.

31.     As a result, the plant discharged through its wastewater, this group of synthetic chemical compounds.

32.      In particular, upon information and belief, Defendants have manufactured and distributed to this plant, and as a result the plant has discharged the following PFCs: GenX, perfluorocarboxyl acids ("PFCAs"), perflurosulfonic acids ("PFSAs"), perfluoroalkylether carboxylic acids with one ether group ("mono-ether PFECAs"), perfluoroalkyl ether carboxylic acids with multiple ether groups ("multi-ether PFECAs"), perfluorooctanoic acids ("PFOAs") (including ammonium perfluorooctonate ("APFO")), perfluorooctane sulfonate ("PFOS"), Perfluoro-2-propoxypropanoic acid ("PFPrOPrA"), Nafion, and Nafion wastes and other wastes and breakdown products of these chemicals (some of which are called legacy and emerging PFCs).

33.     PFCs are highly toxic to humans. Scientists have linked PFCs to kidney cancer, testicular cancer, prostate cancer, ovarian cancer, non-Hodgkin lymphoma, liver disease, ulcerative colitis, thyroid disease, hypercholesterolemia, and pregnancy-induced hypertension, among other illnesses.

34.     In light of the dangers posed by PFCs, the U.S. Environmental Protection Agency ("EPA") recently established a lifetime health advisory level ("HAL") of 70 ng/L (parts per trillion or "ppt") for the sum of the PFOA and PFOS concentrations in drinking water. This preliminary standard will likely be lowered in the future to account for the risk that GenX causes cancer and to account for any special harm that GenX may present to vulnerable populations such as children and individuals exposed to multiple PFCs.

35.     Moreover, PFCs are extremely difficult to remediate because they are not

---

[4] Id.

biodegradable. "Long-chain PFCs"—so called because they have six or more carbon atoms—can persist in the environment for over 2,000 years. And even short-chain PFCs do not biodegrade quickly. A recent DuPont study found that GenX—a short-chain PFC—biodegraded by less than one percent after 28 days. Other studies have confirmed that long-chain PFCs and their short- chain alternatives are "equally persistent."

36.     Additionally, it is extremely difficult to clean air, water, or property contaminated by PFCs because the chemicals bond with proteins in the cells of living organisms and adhere to sediment, scale, and pipes. Normal drinking water filtration systems do not remove the PFCs effectively.

37.     This is particularly hazardous, because PFCs can persist in the human body for decades.

38.     From the 1950s to the early 2000s, DuPont relied heavily on PFOA—a long-chain PFC with 8 carbon atoms—to make Teflon and other non-stick products. Throughout this period, DuPont conducted a robust series of animal studies, which strongly suggested that PFOA might be toxic. At the same time, DuPont conducted a smaller—but still significant—set of studies demonstrating that humans exposed to PFOA developed a variety of illnesses. Despite the clear warning signs that DuPont received from its data, it continued to profit from the distribution of PFOA. DuPont lied to regulators to hide the fact that it was endangering people who were exposed to a product it new to be ultra-hazardous. In 2015, as part of a settlement with West Virginia residents, an expert panel of epidemiologists determined that, by discarding PFOA into drinking water, DuPont caused West Virginians to develop kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, hypercholesterolemia, and pregnancy-induced hypertension.

39.     Since the 1980s, DuPont and 3M have distributed not just PFOA, but GenX and similar PFCs. In the early 2000s, when government regulators pressured DuPont to stop using PFOA in its manufacturing processes, DuPont began to replace PFOA with its close chemical cousin,

GenX. But GenX might be even more toxic than PFOA. Overlooking the results of its own toxicity studies, DuPont has distributed GenX to be used in the treatment of textiles, showing the same cold disregard for human health that it showed when it discharged PFOA. And, just as it did with PFOA, DuPont has concealed its dangerous distribution and discharge practices from government regulators. Plaintiffs are now paying the price of Defendants' failure to learn from their mistakes.

40.     Since the 1960s, DuPont has worked to conceal a bevy of scientific evidence suggesting that PFOA is harmful to human health and the environment.

41.     In 1961, DuPont researchers conducted the first safety test of PFOA, administering PFOA to rodents. The researchers noted that the rodents had enlarged livers—a classic response to poison—and recommended further testing.

42.     In 1962, DuPont performed a second safety test of PFOA and found that rodents exposed to PFOA had enlarged livers, kidneys, adrenal glands, and testes. That same year, DuPont asked human subjects to smoke cigarettes laced with PFOA and observed, "Nine out of ten people in the highest-dosed group were noticeably ill for an average of nine hours with flu- like symptoms that included chills, backache, fever, and coughing."

43.     In 1966, DuPont researchers discovered that PFOA was toxic to fish.

44.     These toxicity tests prompted DuPont staff to consider safe mechanisms for disposing of PFOA. In 1966, DuPont staffers suggested disposing of PFOA in closed steel drums so that it would not leak into the air or into drinking water.

45.     When Defendants distributed their PFOA and other PFC product to the Galey & Lord site in Society Hill, located on the banks of the Great Pee Dee River, they made no efforts to inform or to make sure the product could not find its way into the water system.

46.     Throughout the 1970s, DuPont continued to collect evidence that PFOA could accumulate in the human body and cause a variety of illnesses. In 1978, 3M which manufactured PFOA for DuPont—told DuPont that PFOA had accumulated in the blood of 3M employees who

had been exposed to the substance. DuPont then tested its own employees and found that they too had PFOA in their blood.

47.    In 1978, DuPont began to review employee medical records and found that workers exposed to PFOA and similar chemicals at DuPont's New Jersey plant had increased rates of endocrine disorders. DuPont also found that workers exposed to PFOA more often had abnormal liver function test results. Nevertheless, DuPont did not disclose its findings to regulators and did not disclose this to textile finishers like the Galey & Lord facility.

48.    In 1979, DuPont and 3M conducted additional tests and discovered that PFOA caused abnormal enzyme levels in dogs and fatal illnesses in monkeys.

49.    Despite the growing body of evidence suggesting that PFOA was toxic, Defendants continued to distribute the PFC laden products to textile plants in South Carolina including Galey & Lord in Society Hill.

50.    As part of the operations at the Galey & Lord facility in Society Hill, the wastewater passed through and settled into industrial sludge lagoons located on the banks of Great Pee Dee River. The Defendants knew or should have known that this practice was occurring, was commonplace, and created an inevitable environmental disaster due to leaching and overflow.

51.    To amplify the damage caused by the ultra-hazardous activity of selling this product and failing to fully inform the textile plants of the nature of the product, the plant in Society Hill regularly excavated its sludge from the wastewater ponds and the sludge was distributed over row crop fields as fertilizer.  Defendants, due to their ongoing interactions with the facility and its owners, knew or should have known of the practice and did nothing.

52.    This meant that the PFAs were being directly applied to multiple sites in South Carolina, particularly in the counties surrounding the facility, leaching into groundwater, causing a degradation of Plaintiffs' property.

53.    As Defendants' distribution of PFOA increased, so did the evidence that PFOA was

dangerous. In 1981, DuPont learned that PFOA caused birth defects in rodents. As a result of this study, DuPont removed female workers from jobs that caused PFOA exposure at its Washington Works plant in West Virginia. But DuPont did not issue any sort of warning to anyone who worked elsewhere or to anyone to whom they distributed the product. Nor did DuPont report its concerns about PFOA to the EPA or to the public.

54.      In 1988, DuPont researchers concluded that PFOA caused Leydig cell tumors in rodents. As a result, DuPont internally classified PFOA as a possible carcinogen (*i.e.*, a potential cancer- causing substance).

55.      While the newly discovered links between PFOA and cancers prompted DuPont to warn its employees about the potential hazards of the chemical, DuPont did not warn the communities that surrounded its plants or the plants to whom Dupont distributed the product.

56.      In 1994, a DuPont committee drafted a "white paper" about PFOA. The paper discussed a study published in the *Journal of Occupational Medicine*, which found that workers exposed to PFOA were more likely to die of prostate cancer. In light of that study—as well as the other evidence that PFOA was toxic—the authors of the white paper considered strategies for "replac[ing] [PFOA] with other more environmentally safe materials."

57.      By 2000, 3M—which supplied most of DuPont's PFOA—decided to stop manufacturing the substance. However, neither 3M nor Dupont ever warned the people in Society Hill that these PFC's which had been used for decades to create water and stain resistant textiles were extremely dangerous and could contaminate drinking water and soil. Instead of looking for safe PFOA alternatives, however, DuPont resolved to manufacture PFOA on its own.

58.      DuPont faced a problem: if it told regulators about the dangers of PFOA and its components, the regulators might not let DuPont produce it. DuPont decided to lie.

59.      On May 3, 2001, in attempting to obtain additional permits in North Carolina, Dupont submitted an application which contained several false claims about the health effects of

11

APFO, including: (i) a claim that there had been "no observed health effects in workers" in the forty years that DuPont had used the chemical; (ii) a claim that "epidemiological data from others in industry supports its conclusion that APFO does not pose a health concern to humans or animals at levels present in the workplace or environment"; and (iii) a claim that the compound "is neither a known developmental toxin nor a known human carcinogen." Given all of the studies in its possession, DuPont knew or should have known that these statements were inaccurate.

60.    While Dupont lied about its own wastewater practices in producing PFC's, it ignored or willfully blinded itself to the practices of those who were receiving the chemicals for textile treatment.

61.    The Defendants knew and understood the textile process, the use of PFCs in the treatment of textiles, the necessary production and disposal of industrial wastewater in that process.

62.    In 2011 and 2012, DuPont received the results of the first comprehensive study of the effects of PFOA on human health—called the "C8Health Project" (because PFOA is sometimes known as C8)—which confirmed that PFOA causes cancer and a host of other health problems in humans. The C8 Health Project was created as part of the settlement agreement reached in *Jack W. Leach, et al. v. E.I. du Pont de Nemours & Company*, No. 01 Civ. 608 (W.Va., Wood County Circuit Court, April 10, 2002). That case—and 3,000 others like it— alleged that a DuPont plant in Parkersburg, West Virginia spilled PFOA into the Ohio River, contaminating the drinking water of more than 60,000 people in West Virginia and Ohio. The C8 Health Project tracked health outcomes for those individuals, to determine the extent to which PFOA caused disease. The project was one of the largest toxicology/epidemiology studies ever conducted, with 69,030 study participants providing health data and blood samples for laboratory testing. Three world-renowned epidemiologists (the C8 Science Panel) analyzed 55 health outcomes for this group and concluded that PFOA was probably linked to six outcomes: kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, hypercholesterolemia, and pregnancy- induced

hypertension.

63.     Similarly, in 2013, a study of humans exposed to PFOA suggested that PFOA exposure was linked to kidney cancer, testicular cancer, prostate cancer, ovarian cancer, and non-Hodgkin lymphoma.

64.     Despite these sobering results, the Defendants continued their reckless distribution of PFCs across South Carolina, while providing false assurances to state regulators that it was processing PFCs in a responsible manner.

65.     In the early 2000s, when the EPA learned of the dangers associated with PFOA, DuPont knew that it would soon have to find a replacement product. DuPont eventually settled on GenX as the best available alternative to PFOA.

66.     In 2009, DuPont and the EPA reached a consent order pursuant to the Toxic Substances Control Act ("Consent Order"), in which DuPont agreed to modify its Teflon manufacturing process, replacing PFOA with GenX. In negotiating this agreement, DuPont represented that GenX would probably be safer than PFOA because it would biodegrade and pass through the human body more quickly, causing less damage. Despite this representation, the Consent Order stated that "EPA ha[d] concerns that [GenX] w[ould] persist in the environment, . . . bioaccumulate, and be toxic ('PBT') to people. . . ." In light of those concerns, the Consent Order instructed DuPont to study whether GenX was biodegradable and whether GenX caused illnesses in animals. The order further instructed DuPont to "recover and capture (destroy) or recycle [GenX] from all the process wastewater effluent streams and air emissions (point source and fugitive) at an overall efficiency of 99% . . .". The same contaminants that were alarming the EPA in the Teflon manufacturing process were also being sold by Defendants to be used at the Galey & Lord site for treatment of textiles.

67.     When DuPont conducted the studies contemplated by the Consent Order, it learned that the EPA was right to be concerned about GenX. On March 15, 2010, DuPont submitted a

study to the EPA, showing that GenX—like PFOA—was not biodegradable. Consistent with government guidelines, DuPont's study measured the extent to which GenX biodegraded over 28 days. The study authors found that GenX did not biodegrade at all during the test period. More specifically, they found that:

> [b]ased on the residue analysis, the biodegradation of the test substance [i.e., GenX] was 0% and there was hardly any change for the test substance in the 'abiotic' vessel during the testing period. The BOD results showed that biodegradation of the test substance was both <1% after 14 and 28 days. The test was valid because the level of biodegradation of [a control] substance aniline exceeded 40% after 7 days, and 65% after 14 days. Therefore, the test substance was not inherently biodegradable under this test condition.

68.    In addition, the animal studies contemplated by the Consent Order demonstrated that rodents exposed to GenX—like rodents exposed to PFOA—suffered severe health consequences. In July 2010, DuPont submitted the results of two rodent studies to the EPA, showing that rodents exposed to GenX had birth defects, early birth and low birth weight, liver necrosis (i.e., dead liver tissue), and cellular deformation indicative of liver disease and early-stage cancer.

69.    More specifically, DuPont's studies showed that, among rodents exposed to GenX:

> There was a dose-related increase in the number of dams [female rodents] found with early deliveries on GD 21.
>
> In addition, mean fetal weight was 8 and 28% lower (statistically significant) than controls at 100 and 1000 mg/kg/day, respectively.
>
> A higher mean litter proportion of 14th rudimentary ribs was observed in the 1000 mg/kg/day group, resulting in a higher mean litter proportion of total skeletal variations and total developmental variations . . . .
>
> In addition, the study's authors found "[f]ocal necrosis of the liver in some

females in the 100 and 1000 mg/kg/day groups in a dose-related manner." Similarly, non-maternal rodents exposed to GenX had liver diseases, including focal necrosis and an increase of peroxisome proliferators (which have been shown to cause liver disease and induce tumors).

14

70.     On January 28, 2011, DuPont submitted the results of another rodent study to the EPA. Like the earlier studies, the new study found that rodents exposed to GenX developed liver necrosis and liver cell damage that could be a precursor to cancer. As the study's authors put it:

> Hepatocellular hypertrophy [among rodents exposed to GenX] was characterized by cytoplasmic eosinophilic stippling that is consistent with peroxisome proliferation. In the 5 mg/kg/day F0 males and females, other liver lesions included increases in single cell necrosis, mitotic figures, lipofuscin pigment, and focal necrosis (females only).

71.     Despite these test results—and their marked similarity to the results of the PFOA animal studies—DuPont continued to produce and distribute these chemical products to South Carolina textile plants.

72.     Recognizing the dangers and the liability that this hazardous chemical product could cause, DuPont made false statements to North Carolina regulators that "[a]ll process wastewater generated from [the facility producing GenX] is collected and shipped off-site for disposal"; and (ii) "[n]o process wastewater from this manufacturing facility is discharged to the site's biological [wastewater treatment plant] or to the Cape Fear River." This wastewater concern was not shared with textile sites like Galey & Lord and as a result, the PFAS wastewater was leached into the river and the PFAS contaminated sludge was spread over fields throughout South Carolina.

73.     Meanwhile, DuPont repeatedly tried to disprove the results of the rodent studies it was required to submit to the EPA. But each rodent study only confirmed that GenX was toxic to animals. Unable to obtain the results it wanted, DuPont asserted—without justification—that the rodent studies were irrelevant to the question whether GenX could harm humans.

74.     In 2013, DuPont completed studies showing that rodents exposed to GenX had a higher incidence of liver tumors, pancreatic tumors, and testicular tumors. The rodents exposed to GenX also had a higher incidence of uterine polyps, though the study authors did not find the incidence of polyps to be statistically significant. In scientific terms:

15

Test substance-related **neoplastic changes** were observed at the high dose (500 mg/kg/day in females; 50 mg/kg/day in males) and included **hepatocellular tumors** in females and, in males, equivocal **increases in pancreatic acinar cell tumors and testicular interstitial cell tumors.**

75.     Despite the fact that the 2013 rodent study followed standard scientific protocols— and was very similar to the rodent studies that DuPont had previously used to establish PFOA's toxicity to humans— DuPont insisted that the results were not relevant to human health:

Based on the high dose threshold for these tumor responses in this study, the lack of genotoxicity of the test material across a battery of in vitro and in vivo tests, and the known responses of the rat versus other species, including humans, to these PPAR(a) associated tumor responses, these tumor findings are not considered relevant for human risk assessment.

76.     In 2014, DuPont scientists dismissed the results of yet another, more extensive evaluation of the toxic effects of GenX, "Evaluation of chronic toxicity and carcinogenicity of ammonium 2,3,3,3- tetrafluoro-2-(heptafluoropropoxy)-propanoate in Sprague–Dawley rats" ("GenX Report"). The study— conducted by DuPont scientists—again showed that GenX caused serious health problems in rodents, including "[i]ncreases in enzymes indicative of liver injury," and tumor cells—some of them cancerous— in the liver, kidneys, stomach, tongue, pancreas, and testes.

77.     Putting that point in more scientific terms, the GenX Report stated that, "[at] the interim necropsy, **non-neoplastic** test substance-associated effects were present in the liver of males at 50 mg/kg and in the liver and kidneys of females at 500 mg/kg."

78.     In addition:

Kidney changes in females at 500 mg/kg included tubular dilation, edema of the renal papilla, **transitional cell hyperplasia in the renal pelvis**, tubular mineralization, **renal papillary necrosis** and CPN. Tubular dilation frequently occurred in an ascending pattern extending from the papilla to the outer cortex, while at other times it was present only in the papilla. **Edema of the papilla** was characterized by increased rarefaction or myxomatous change in the papillary interstitium, sometimes with polypoid protrusions from the lateral surface of the papilla. The **edema** and tubular dilation were often associated with hyperplasia of the transitional cell epithelium lining the papilla and pelvis. Small foci of tubular mineralization were often present and, in some animals, necrosis ofthe tip of the papilla was present.

79.     Moreover, in female rodents given 500 mg/kg, "statistically significant increases in

**hyperplasia** of squamous epithelium were observed in the nonglandular stomach (limiting ridge only) and tongue (in association with subacute/chronic inflammation in the tongue)." Hyperplasia is the enlargement of an organ or tissue caused by an increase in the reproduction rate of its cells, often as an initial stage in the development of cancer.

80.    The GenX Report ultimately concluded that the rodents suffered from tumors called carcinomas and adenomas:

> Compound-related neoplastic changes occurred in the livers of females administered 500 mg/kg and included **increased incidences of hepatocellular adenoma and carcinoma.** These tumors occurred in association with the degenerative and necrotic liver lesions observed at this dose as described above. Hepatocellular tumors and test substance- associated degenerative and necrotic lesions were not observed in females at lower doses and **the incidences of hepatocellular tumors were similar in all male groups.** . . .

> In males administered 50 mg/kg, **a statistically significant increase in the combined incidence of pancreatic acinar cell adenomas and carcinomas was seen,** but neither the incidence of adenoma or carcinoma alone was statistically increased, although the incidence of carcinomas (2.9%) was slightly outside the historical range of 0–1.7%. …

> The incidence of **Leydig cell adenomas** (11.4%) was increased above historical control ranges for this tumor (0–8.3%) in males administered 50 mg/kg, although this increase was not statically significant compared to controls. In addition, a Leydig cell adenoma was present in 1 male at the interim necropsy in the 50 mg/kg group. The incidence of Leydig cell hyperplasia was also increased above historical control range in this group at terminal sacrifice (also 0– 8.3%); although again, this incidence was not statistically significant versus controls. However, comparison to within- study controls was complicated by the fact that controls had a relatively high incidence of Leydig cell hyperplasia (10%). Based on the above considerations and the known activity of PPARα agonists to produce Leydig cell hyperplasia and adenomas in rats, the relationship to the test compound for **these lesions was considered equivocal in this study.**

81.    These results should have caused DuPont to classify GenX as a potential carcinogen. As a public health expert recently testified against DuPont in another case, "The only time that you can discount

. . . tumor-causing effects, in animals, is if you know the mechanism by which [a] substance is causing cancer [in the animals] and you know that mechanism is not relevant to humans." The DuPont scientists who conducted the GenX Report specifically acknowledged that they did not

have "definitive" data on all of the mechanisms by which GenX caused tumors. Yet DuPont dismissed the results as likely irrelevant to humans.

82.    DuPont offered very feeble reasons for discounting the results of the GenX report, suggesting that it was looking for any possible excuse to justify its decision to discharge GenX into the Cape Fear River. For example, DuPont claimed that the high doses of GenX given to the rodents were not representative of human exposures to GenX. But all two-year cancer rodent studies follow the protocol developed by the U.S. National Toxicology Program, which requires that rodents receive an elevated dose of a potential toxin.

83.    The DuPont scientists who authored the GenX Report also turned a blind eye to the well- known fact that, in light of its molecular structure, GenX likely disrupts cellular functions. GenX has a chemical carboxyl group which likely bonds with cells and impairs normal growth and function, which could cause the cancer and other diseases that the scientists observed in the rodents.



84.    Finally, the authors of the GenX Report ignored the fact that rodent studies predicted that PFOA—which is chemically similar to GenX—was toxic to humans, and that prediction was borne out by the C8 Health Project. The authors of the GenX Report therefore had reason to believe that rodents could be used to gauge the toxicity of PFCs to humans.

85.    Later studies conducted by independent researchers show just how hard DuPont scientists must have worked to dismiss the results of their rodent studies. For example, in January 2018, Stockholm University published the results of a rodent study suggesting that GenX is even

more toxic than PFOA.[5]

86.     Later studies conducted by independent researchers show just how hard DuPont scientists must have worked to dismiss the results of their rodent studies. For example, in January 2018, Stockholm University published the results of a rodent study suggesting that GenX is even more toxic than PFOA.

87.     Despite this knowledge, 3M sold its fluorochemical under the name Scotchguard to the Galey and Lord facility knowing the toxic chemical would be used in manufacturing textiles at the plant and would generate toxic waste containing PFAS byproducts.

88.     DuPont sold its fluorochemical under the name of Zonyl to the Galey and Lord facility knowing the toxic chemical would be used in manufacturing textiles at the plant and would generate toxic waste containing PFAS byproducts.

89.     Daikin sold its fluorochemical under the name of Unidyne to the Galey and Lord facility knowing the toxic chemical would be used in manufacturing textiles at the plant and would generate toxic waste containing PFAS byproducts.

90.     MIP sold its fluorochemical under the name of Repearl to the Galey and Lord facility knowing the toxic chemical would be used in manufacturing textiles at the plant and would generate toxic waste containing PFAS byproducts.

91.     As a result of the Defendants' knowingly selling unreasonably dangerous and hazardous chemicals to the Galey and Lord facility, Plaintiffs have been subject to significantly increased PFAS exposure, beyond which would be expected (or hoped) for the average person living in this state.

92.     The Plaintiffs' wells were tested by SCDHEC and this testing showed that their wells were contaminated with PFAS chemicals at levels many times greater than the HAL

---

[5] Gomis, et al., Env. Intern. 113 (2018) at 1 ("The toxicity ranking using modeled serum (GenX > PFOA > PFHxA > PFBA) and liver (GenX > PFOA≈PFHxA≈PFBA) concentrations indicated that some fluorinated alternatives have similar or higher toxicpotency than their predecessors when correcting for differences in toxicokinetics.").

established by the EPA.

93.    Plaintiffs drank, cooked with, bathed in, and used this dangerously contaminated water on their lawns and gardens and as drinking water for their animals. As a result, Plaintiffs have been exposed to and consumed PFAS chemicals through each of these modes of exposure.

94.    Defendants' PFAS toxins have also contaminated their soil and home through water, dust, and steam. Plaintiffs will continue to be exposed to these dangerous chemicals until their homes, properties, and wells are fully remediated. Moreover, the contamination has caused economic loss and loss of enjoyment of Plaintiffs' property.

95.    The knowledge that Plaintiffs have, for years, consumed water contaminated with PFAS levels far in excess of what the EPA has advised should be consumed has resulted in significant mental anguish and emotional distress over their current and future health and that of their children.

96.    The motive for Defendants' decades-long scheme to deceive the public is apparent. Money was a higher priority than the safety and well-being of people like the Weatherfords and other citizens of South Carolina similarly situated.

## CLASS ALLEGATIONS

97.    As noted above, Plaintiffs bring this action on behalf of itself and all others similarly situated as a class action under Rule 23 of the Federal Rules, defined as follows:

> All persons or entities who has any beneficial interest in any real property that has been damaged by the contamination and trespass of PFAs chemicals emanating from the Galey and Lord Plant located at 670 North Main Street, Society Hill, South Carolina 29593 during the period from January 1, 2015 through the present. (the "Class").

> Excluded from the Class are current and former officers and directors of the Defendants; members of the immediate families of the officers and directors of the Defendants; the Defendants' legal representatives, heirs, successors, assigns, any entity in which either of them has or had a controlling interest; any federal, state, or local governmental agencies; any judges who have decided or are assigned to decide some or all issues in this case any persons related to a judge in a manner that would

disqualify the judge from hearing the case; and any chambers staff working for the assigned judge or other courthouse staff who perform tasks relating to this matter.

98.     Plaintiffs reserve the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with Plaintiffs' motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

99.

100.     This action is proper for Class treatment under Rules 23(b)(1)(B) and 23(b)(3) of the Federal Rules of Civil Procedure.

1.     *Numerosity*: While the exact number and identifies of other Class Members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are hundreds of Class members, whose joinder in this action would be impracticable. By examination of government and other regularly kept records, it is apparent that the class is sufficiently numerous that joinder of all members is impracticable. The number of affected members will only increase and are as easily identified as those who have already been found to be trespassed upon and damaged by PFAs chemical products.

101.     The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts.

102.     *Commonality and Predominance*: There is a commonality in questions of law and common nucleus of operative facts affecting the Class, in that Defendants' reckless, negligent, and improper conduct has infringed upon the rights of the Plaintiffs and causes damage to the Plaintiffs in the same or similar fashion as the Class. Moreover, the answers to the questions of law and operative facts will drive the resolution of the litigation and which are capable of class wide resolution. Such questions are common to all Class members and predominate over any questions affecting individual Class Members. These include:

a. Whether Defendants negligently, recklessly, and wantonly failed to warn concerning use and storage of the long chain carbons or to correspondingly assure that there was a proper attempt to remediate or clean up the basins at the Galey and Lord Plant;

b. Whether distribution of the product into the stream of commerce without proper stewardship constitutes an ultrahazardous activity and the Defendants are therefore liable for the trespass, nuisance, and property damage resulting from the contaminants presence on the properties of the class;

c. Whether the failure to remediate or clean up the basis at the Galey and Lord Plant resulted in the release of PFAs contaminated wastewater into Cedar Creek and the Great Pee Dee River;

d. Findings of Fact made by the Environmental Protection Agency ("EPA") regarding the Defendants' chemical products and the corresponding known damage caused but the operation of the Galey and Lord Plant;

e. Determinations made by the South Carolina Department of Health and Environmental Control ("SCDHEC") regarding soil contamination and the presence of the chemical products on the class members property and who should bear responsibility for the necessary clean up and remediation of these properties;

f. The impact of enforcement actions by EPA and SCDHEC on the determination of who should bear the financial burden of increased need for water filtration and remediation costs;

g. Whether sludge from the Galey and Lord Plant containing the Defendants' products applied to Class Members fields has resulted in a loss of use and enjoyment of their contaminated property;

h. Whether the sludge from the Galey and Lord Plant containing the Defendants' products has resulted in a reduction in the value of the property value in the Classes property;

i. Whether the actions of Defendants, resulting in the presence of PFAS and/or PFC compounds (the Defendants' products) constitutes a continuing trespass of the Class Members' property;

j. Whether the Defendants should be responsible for continued sampling and monitoring of the Classes' property;

k. Whether Defendants' actions constitute a private nuisance unreasonably interfering with the use and enjoyment of nearby real property;

l. Whether, and to what extent, injunctive relief should be imposed on Defendants' to prevent such conduct in the future;

m. Whether the members of the Class have sustained damages as a result of the Defendants' wrongful conduct; and

n. The appropriate measure of damages and other relief.

The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings or incompatible standards of conduct for Defendants, especially when dealing with commerce of toxic chemicals. Additionally, individual actions may be dispositive of the interest of all members of the Class, although certain Class members are not parties to such actions.

103. *Superiority*: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would

be difficult and not economical for the individual members of the Class to obtain effective relief from Defendants' misconduct.  Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

104.    *Typicality*: Plaintiffs' claims are typical of, and are not antagonistic to, the claims of all Class Members, in that Plaintiffs and members of the Class sustained damages arising out of Defendants' uniform wrongful conduct.

105.    *Adequacy*: Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel with substantial experience in litigating complex cases, including class actions.  Plaintiffs' claims are representative of the claims of the other members of the Class.  That is, Plaintiffs and members of the Class sustained damages as a result of Defendants' uniform conduct.  Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs.  Both Plaintiffs and its counsel will vigorously prosecute this action on behalf of the Class and have the financial ability to do so.  Neither Plaintiffs nor counsel have any interest adverse to other Class Members. Rather, Plaintiffs share the same interest as all Class Members in remedying Defendants' unlawful conduct.

106.    *Ascertainability*: Inclusion in the class can be determined by objective criteria. The presence of Defendants' products on property and in the water of class members is able to be tested and verified.  The spread of the product is able to be established through scientific evidence.  While the exact number and identities of other Class members are unknown to Plaintiffs at this time, Plaintiffs are informed and believe that there are at least hundreds of Class members that can be easily ascertained at this time.  For example, government documents reveal that over a hundred properties'

groundwater has already been tested and contamination levels have necessitated the placement of nearly twenty (20) wells for protection from the contaminating products. The number of affected members will only increase and are as easily identified as those who have already been found to be trespassed upon and damaged by PFAS chemicals.

107.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(2) are met, as Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive or equitable relief with respect to the Class as a whole.

108.     The prerequisites to maintaining a class action for injunctive relief or equitable relief pursuant to Rule 23(b)(3) are met, as questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

109.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## FOR A FIRST CAUSE OF ACTION:
## NEGLIGENCE

110.     The Plaintiffs reassert and reemphasize all allegations herein stated.

111.     Defendants engaged in a business that involved formulation and distributing PFAS chemicals. Defendants understood the processes engaged in by textile finishing plants, including the Galey and Lord facility. Defendants knew or through the exercise of reasonable care should have known that the fluorochemicals sold to the Galey and Lord facility would leak into the soil and groundwater of Plaintiffs' property.

112.     Defendants owed and continues to owe to the plaintiffs a duty of care. This duty includes a duty to not allow their toxic chemical products to leak into the soil and groundwater.

113.     The Defendants failed to exercise reasonable care in the designing, researching,

testing, marketing, supplying, promoting, packaging, selling, and/or distributing of PFAS chemicals.

114.    Defendants knew or should have known of the risks to the property caused by PFAS chemicals. These risks and dangers are more fully set forth above.

115.    Defendants have a duty to comply with all Federal, State, and local laws and regulations concerning the prevention, detection, and reporting of discharges of toxic chemicals.

116.    Defendants knew or should have known that their manufacture and distribution of PFAS chemicals to the Galey and Lord facility presented a serious risk of injuries to persons or property due to the likelihood of leaks and discharges into the soil and groundwater.

117.    Defendants knew or should have known that PFAS chemical leakage would present a serious risk of injury to persons and the environment. Despite this knowledge, Defendants' manufacturing and distribution practices with no stewardship or warning were inadequate, improper, and reckless.

118.    Defendants knew or should have known that PFAS leaks would present serious risk to persons and property because of the possibility of contamination of water and/or soil. Despite this knowledge, Defendants negligently, carelessly, and recklessly distributed these products to the Galey and Lord Plant, resulting in a failure to prevent foreseeable injuries to plaintiffs and their property.

119.    Defendants knew or should have known that the Galey and Lord facility was not properly storing hazardous material in a manner commensurate with the risks they knew their products posed, resulting in the hazardous chemicals leaking and continuing to leak and spread PFAS chemicals into the surrounding soil and groundwater.

120.    Defendants knew or should have known that the toxic sludge was being spread on Plaintiffs and other member of the Class as early as 1993.

121.    Defendants' negligence, carelessness and recklessness include, without limitation,

the following:

a.    improperly manufacturing, selling, and distributing known toxic chemicals into the stream of commerce and for Defendants' benefit in South Carolina;

b.    improperly handling materials in the shipping to the Galey and Lord facility;

c.    engaging in improper and/or inadequate packaging and instruction;

d.    engaging in improper delivery and storage practices and procedures on the site, including, but not limited to, delivery, failure to collect or re-gather, and knowledge of accumulated hazardous material that will cause harm;

e.    systematically failing to represent accurately to the Plaintiffs, either directly or indirectly, that PFAS chemicals can pose a health hazard and contaminate property or that leakage was likely to occur;

f.    systematically failing to warn, or adequately or sufficiently warn, either directly or indirectly, the foreseeably impacted property owners of the hazards and costs associated with the leakage of the PFAS chemicals or of the property contamination their leakage could cause;

g.    failure to properly inspect and test the Galey and Lord facility used for Defendants' benefit in South Carolina to determine if the site was suitable for its intended purpose;

h.    failure to properly audit and monitor the Galey and Lord facility used for Defendants' benefit, and to maintain adequate records and properly investigate the leakage of PFAS chemicals;

i.    failure to properly test for and detect the release of PFAS chemicals into the soil and groundwater surrounding the Galey and Lord facility;

j.    failure to determine the systematic inability of the Galey and Lord facility to safely store PFAS chemicals;

k.    failure to remove or recommend the removal of the PFAS chemicals or to undertake the responsibility to test for and remove the PFAS and further failure to test, remedy, replace or treat soil and groundwater contaminated as a result of the leaking PFAS chemicals;

l.    failure to properly train and monitor all agents or employees of Defendants in the distribution, maintenance, use, care and supervision of the PFAS containing products;

m.    failure to systematically employ state-of-the-art equipment, materials and procedures customary in the industry to avoid leaks and spills of PFAS chemicals;

n.    failure to replace or repair outmoded or faulty techniques of shipping, packaging, delivery, and storage to prevent the leakage and spread of PFAS

chemicals;

o.      failure to comply with the South Carolina Pollution Control Act, S.C. Code Ann. §48-1-10 (1976) et seq.;

p.      failure to comply with the South Carolina Constitution Article I, Section 13, which forbids the taking of property by private parties without paying just compensation;

q.      failing to take any steps to assess or prevent the Galey and Lord facility from leaking PFAS chemicals into the surrounding soil and groundwater, thereby greatly increasing risk of exposure to plaintiffs' person and property;

r.      systematically failing to acknowledge responsibility for the source of contamination at the Galey and Lord facility;

s.      committing any and all of the foregoing acts systematically and individually against affected property owners; and

t.      committing any or all of the foregoing acts recklessly and with disregard to the safety of Plaintiffs and their property.

122.    As a direct and proximate result of Defendants' systematic negligence in designing, maintaining, controlling, monitoring these toxic chemicals, PFAS chemicals have leaked into the surrounding soil and groundwater injuring plaintiffs and their property. Plaintiffs will continue to suffer harm including great financial loss; the loss of the use and enjoyment of their property; and the diminution in value of their property.

**FOR A SECOND CAUSE OF ACTION:**
**STRICT LIABILITY FOR ULTRAHAZARDOUS**
**ACTIVITY**

123.    The Plaintiffs reassert and reemphasize all allegations herein stated.

124.    PFAS chemicals are unreasonably dangerous to humans and the environment and the Defendants should reasonably have expected that Plaintiffs and their property would be affected by the PFAS chemicals that they manufactured and sold.

125.    Defendants manufactured, handled, and distributed PFAS chemical products which have polluted the environment and leaked from the Gayley and Lord facility into the soil and

groundwater of Plaintiffs' property.

126.     Defendants coordinated an effort to get rid of its toxic sludge—which it knew to be hazardous—by spreading the wastewater full of hazardous substances on Plaintiffs and other member of the Classes' property.

127.     The Defendants expected, or reasonably should have foreseen, that the PFAS chemicals that they were selling, distributing, supplying, manufacturing, and/or promoting would reach Plaintiffs without any substantial change in the condition of the compounds from their state when initially distributed.

128.     The Defendants labeled, distributed, and promoted their products which were dangerous and unsafe for the use and purpose for which it was intended despite knowing the probable consequences of exposure to PFAS.

129.     Defendants or their agents were responsible for the dangerous products sold and distributed to the Galey and Lord facility and received financial benefits from that distribution.

130.     As a direct and proximate result of Defendants' ultrahazardous activities, the Plaintiffs have suffered and will continue to suffer damage into the indefinite future to include real property damage; out-of-pocket expenses for water filtration systems; and diminution in property value.

### FOR A THIRD CAUSE OF ACTION:
### TRESPASS

131.     The Plaintiffs reassert and reemphasize all allegations herein stated.

132.     Defendants are the source of and are responsible for the PFAS chemical products which have been released upon and into the property of the Plaintiffs and Members of the Class.

133.     At no time did Defendants have permission or license to leak PFAS chemical products into the soil and groundwater of Plaintiffs' property.

134.     Defendants' chemical products and the inevitable leaking of the same into the soil and groundwater of Plaintiffs' property, have invaded and interfered with plaintiffs' possessory

interest in their property.

135.    Molecules of dangerous chemicals escaped from the Galey and Lord facility and invaded and remain in the soil and groundwater of Plaintiffs' property. They will remain in the soil and groundwater into the indefinite future and have interfered with the Plaintiffs' possessory interest in their property.

136.    Molecules of dangerous chemicals manufactured sold and distributed by Defendant are present in the soil and groundwater of the Plaintiffs, are the property of Defendants and were allowed into the soil and groundwater by Defendants actions. This amounts to an unauthorized entry onto the land of the plaintiffs without legal authority, and without the permission or license of any State of Federal governmental agency or the plaintiffs.

137.    As a proximate result of Defendants' trespass, the property rights of the Plaintiffs and members of the Class have been injured and continue to be injured, and plaintiffs have suffered financial and economic loss, as well as loss in the use and enjoyment of their property and an increased risk of exposure to PFAS chemicals, and interference with the use and possession of their land by the presence of remediation activities.

## FOR A FOURTH CAUSE OF ACTION:
### NUISANCE

138.    The Plaintiffs reassert and reemphasize all allegations herein stated.

139.    The EPA has placed the Galey and Lord facility on its National Priorities List through a Federal Register Notice and designated it as a Superfund Site.

140.    The Superfund program investigates and cleans-up the most complex, uncontrolled, or abandoned hazardous waste sites in the country.

141.    Based upon evidence it has collected, the EPA determined that Cedar Creek and the Great Pee Dee River, adjacent to and downstream of the Galey and Lord facility are negatively impacted by the site, posing both human health and ecological risks.

142.    SCDHEC has similarly concluded that the contamination at the Galey and Lord

facility poses a significant threat to public health and the environment.

143.   Defendants were engaged in a business that manufactured, sold, and distributed toxic PFAS chemicals.

144.   At all relevant times, the Defendants intended and expected that the Defendants' PFAS chemicals would be sold and used in the State of South Carolina at the Galey and Lord facility.

145.   At all times relevant hereto, the Defendants knew or should have known that PFAS chemicals are hazardous and harmful to real property, animals, and human beings and therefore should have known that the distribution and/or sale of PFAS chemicals would cause injury to individuals like Plaintiffs.

146.   Defendants knew or should have known that their fluorochemicals would generate toxic waste containing PFAS byproducts that would leak into the surrounding soil and groundwater. These hazardous materials invaded the property of the Plaintiffs.

147.   The Defendants had the implied obligation that their actions would not prevent others from enjoying the use of their own property.

148.   The Defendants' actions are unreasonable, unwarrantable, or unlawful use by Defendants, which substantially and unreasonably interferes with Plaintiffs' and Class members' possession of their own real property.

149.   As a further result of Defendants' leaking PFAS chemicals into the soil and groundwater, Defendants have created a private nuisance by causing a need for remediation activities which further endanger persons or property and obstructs the reasonable and comfortable use of Plaintiffs' property.

150.   The presence of dangerous materials on the Plaintiffs' property has caused, and will continue to cause into the non-discernable future, damage to the plaintiffs and their property, and their ability to use and enjoy their property, and therefore plaintiffs have suffered financial and economic loss, as well as the loss of enjoyment and use of their property, and an increased risk of

exposure to dangerous materials, as well as interference in the use and enjoyment of their property due to the presence of remediation activities.

151.   By virtue of the Defendants' reckless, willful, and wanton acts, Plaintiffs and Class members are entitled to an award of punitive damages sufficient to impress upon Defendants the seriousness of its conduct and to deter similar conduct in the future.

152.   Plaintiffs and Class members are therefore entitled to recover compensatory damages, consequential damages, punitive damages, attorneys' fees and costs, an injunction enjoining Defendants' conduct, and any other relief the Court deems appropriate.

## FOR A FIFTH CAUSE OF ACTION:
## PRODUCT LIABILITY FOR DEFECTIVE DESIGN

153.    The Plaintiffs reassert and reemphasize all allegations herein stated.

154.   As commercial designers, manufacturers, distributors, suppliers, sellers, and/or marketers of PFAS, Defendants had a strict duty not to place into the stream of commerce a product that is unreasonably dangerous.

155.   Defendants knew that third parties would purchase PFAS and/or products containing PFAS and use them without inspection for defects.

156.   PFAS and/or products containing PFAS designed, sold, and distributed by the Defendants were applied, discharged, disposed of, or otherwise released onto the lands and/or water in the vicinity of the Plaintiffs. Such discharges occurred at various locations, at various times, and in various amounts.

157.   PFAS and/or products containing PFAS designed, sold, and distributed by Defendants were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

158.   Defendants knew or reasonably should have known that the use of PFAS and/or products containing PFAS in their intended manner would result in the spillage, discharge, disposal,

or release of PFAS onto land or into water.

159.    PFAS and/or products containing PFAS used in the vicinity of the Plaintiffs' property were defective in design and unreasonably dangerous for their intended use because, among other things:

    a.    PFAS cause extensive and persistent surface and groundwater contamination when these chemicals, or products containing them, are used and discharged in their foreseeable and intended manner.

    b.    PFAS contamination in drinking water poses significant threats to public health and welfare.

    c.    Defendants failed to conduct and/or failed to disclose reasonable, appropriate, or adequate scientific studies to evaluate the environmental fate and transport and potential human health effects of PFAS.

    d.    There are and were safe or safer alternatives to PFAS which Defendants could and should have employed.

160.    At all times relevant to this action, products containing PFAS were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

161.    At all times relevant to this action, the foreseeable risk of harm to public health and welfare posed by PFAS outweighed the cost to Defendants of reducing or eliminating such risk.

162.    At all times relevant to this action, a reasonably prudent manufacturer knew or should have known of the significant dangers posed by PFAS.

163.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS and/or products containing PFAS in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

164.    As a direct and proximate result of Defendants' defective and unsafe PFAS and/or products containing PFAS, significant PFAS contamination and damage to the Plaintiffs has occurred and will continue to occur in the future for years to come, causing the Plaintiffs to incur significant damage and injury.

165.    Defendants are jointly and severally liable for all such damages, and Plaintiffs are

entitled to recover all such damages and other relief as set forth below.

166. As a direct and result of the foregoing, Plaintiffs seek compensatory damages in an amount to be determined by a jury at the time of trial.

## FOR A SIXTH CAUSE OF ACTION:
## BREACH OF IMPLIED WARRANTIES

167. The Plaintiffs reassert and reemphasize all allegations herein stated.

168. The Defendants are manufacturers and distributors who deal in goods of the kind, particularly products manufactured to be used in a normal (as opposed to completely contained) industrial textile environment.

169. The products, designed and manufactured by Defendants to include the hazardous PFAS compounds, were not fit for the known and particular use at the Galey & Lord facility.

170. The products, designed and manufactured by Defendants to include the hazardous PFAS compounds, were not fit for the normal and ordinary use as a result of the toxic and migratory nature of PFAS products.

171. As a result, the Defendants have breached the applicable implied warranties and the Plaintiffs and all others similarly situated have been damaged as a result of these breaches.

172. The Plaintiffs are entitled to an amount which would address all of their property damages caused by the breaches of implied warranty and hold the proper party responsible rather than allow Defendants to externalize the cost of manufacturing hazardous products.

## JURY TRIAL DEMANDED

173. Plaintiffs respectfully demand a trial by jury on each count raised in this complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that the Court provide the Plaintiffs and the Class with the following relief:

A.      An Order that this action be maintained as a class action and appointing Plaintiffs as representatives of the Class and appointing the undersigned as Class Counsel in this action;

B.      Plaintiffs recover the general and special damages determined to have been sustained by each of them respectively, including, but not limited to, financial losses, loss of the use and enjoyment of their property and loss due to the increased risk of exposure of person and property to PFAS chemicals, as well as reimbursement of the costs of inspection, analysis, containment, and removal of PFAS chemicals or their contaminants incurred by the Plaintiffs or by the State of South Carolina or the Federal Government in their behalf, loss due to the interference of the use and enjoyment of Plaintiffs' property by plaintiffs due to remediation activities, and all such damages and other relief that is provided by statute, and the judgement therefore be entered herein against the Defendants in an amount to be determined; and

C.      Plaintiffs recover punitive damages in an amount to be determined from Defendants for Defendants' reckless or willful disregard for the property of the Plaintiffs to impress upon the Defendants the seriousness of its misconduct and to deter similar misconduct in the future; and

D.      Order Defendants to i) provide Plaintiffs and members of the Class with safe potable water, to flow from their faucets, at no cost to them; and ii) remediate contaminated groundwater to prevent further negative water quality impacts on Cedar Creek and the Great Pee Dee River;

E.      Plaintiffs recover the costs of this suit, including but not limited to any expert witness fees, together with reasonable attorney's fees; and

F.      The Court grant such other, further or different relief as may be deemed just and proper.

Respectfully submitted,

BY:     s/ A. Gibson Solomons, III
A. Gibson Solomons, III, Esq. (SC Bar #68291)
**SPEIGHTS & SOLOMONS, LLC**
Post Office Box 685 100 Oak Street, East Hampton, SC 29924
Tel: (803) 943-4444; Fax: (803)943-4599
 gsolomons@speightsandsolomons.com

Vincent A. Sheheen (Fed I.D. No. 7016)
Michael D. Wright (Fed I.D. No. 11452)
SAVAGE, ROYALL & SHEHEEN, L.L.P.
P.O. Drawer 10
Camden, S.C. 29021
Telephone: (803) 432-4391
Facsimile:  (803) 425-4812
mwright@thesavagefirm.com

***ATTORNEYS FOR PLAINTIFFS and PUTATIVE CLASS***

December 5, 2022

Hampton, South Carolina